IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIGHT KIDS NYC, INC. and BIGE DORUK, individually on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUARTERSPOT, INC.<br><br>Defendants. | Docket No.: 1:2020CV09172 |

**FIRST AMENDED CLASS COMPLAINT**

Plaintiff Bright Kids NYC, Inc. ("Bright Kids"), and Bige Doruk ("Doruk"), by and through their undersigned attorneys, individually and on behalf of all others similarly situated, alleges as follows against Defendants QuartersSot, Inc. ("QuarterSpot"), Lance Emanuel, Adam Cohen, and the John and Jane Doe Defendants:

**NATURE OF THE ACTION**

1. This class action seeks to save business across the country from the predatory and fraudulent lending practices of Defendants and recover damages suffered by small businesses who have already fallen prey to them.

2. The case is simple.

3. New York has had a strong public policy against usury since time immemorial.

4. The public policy against usury is so strong that usury is classed as a Class D felony.

5. In order to evade New York's strong public policy and criminal laws against usury, Defendants use a sham choice of law provision in their loan agreements with small businesses.

6.     Defendants force their small business victims to sign loan agreements that falsely represent that the transaction took place in the Commonwealth of Virginia, and that QuaterSpot is located in Virginia.

7.     According to QuarterSpot's own judicial admission, QuarterSpot is a Delaware corporation with its principal place of business in Delaware.

8.     However, QuarterSpot's corporate registration form lists New York as its principal place of business.

9.     Regardless, on information and belief, QuarterSpot's ultimate business decisions are not made in Virginia.

10.    Plaintiffs are a New York small business and an individual resident of New York.

11.    It is well-settled that New York courts will not permit usurers to evade the criminal laws of our state through sham choice of law provisions.

> Taking these two exceptions in inverse order, there are reported cases in New York holding that the usury laws are a declaration of this State's public policy. In fact, at least one court has characterized usury as a question of supervening public policy. In fact, at least one court has characterized usury as a question of supervening public policy. (*See Guerin v. New York Life Ins. Co.*, 261 App Div 110; *Matter of Gale v. Hilts*, 176 Misc 277, and *see* Restatement, Conflict of Laws 2d, § 187, Comment g, p 574.) As the Court of Appeals has stated in *Schneider v. Phelps* (41 NY2d 238, 243), "[the] purpose of usury laws, from time immemorial, has been to protect desperately poor people from the consequences of their own desperation." This court would find from these cases that the policy underlying our State's usury laws is in fact of a fundamental nature.
>
> Given that finding, then, the fact that the rate of interested agreed upon here (18 ¼%), in the context of today's economy, does not perhaps shockm the conscience is not determinative. **Rather, to permit a contract executed in New York State to be governed by the laws of a jurisdiction which has apparently chosen not to outlaw usury at all (as opposed to the situation where the laws of another jurisdiction do prohibit usury but in so doing allow a somewhat higher ceiling than that permitted in New York) would, in this court's view, fly in the face of time-honored public policy.**

*North American Bank, Ltd. v. Schulman*, 123 Misc.2d 516, 520-521, 474 N.Y.S.2d 383, 386-87 (N.Y. Sup. Ct. Westchester. 1984) (emphasis added).

12. This principal was recently rearticulated by the Attorney General of New York, who, in criticizing the Office of the Comptroller of the Currency's new rule permitting "rent-a-bank" scheme as allowing evasion of state usury laws, stated: "New York has prohibited usurious interest rates for centuries as a fundamental public policy of the state." Complaint, *New York et al v. Office of the Comptroller of the Currency, et. al.* Case No. 20-cv-5200 (N.D. Cal.).

13. Indeed, a sister federal court, the Eastern District of New York, recently held that *all* the provisions of a usurious contract are void. *Moss v. Premier Bank*, 2020 U.S. Dist. LEXIS 160253, at *9-10 (Sept. 2, 2020).

14. Plaintiffs now bring this class action in order to protect the many thousands of similarly situated victims that have been preyed upon by Defendants through their predatory and unlawful loansharking scheme.

## THE PARTIES

15. Plaintiff Bright Kids NYC, Inc. ("Bright Kids") is business incorporated under the laws of the State of New York, with its principal place of business located in New York.

16. Plaintiff Bige Doruk ("Doruk") is an adult resident and citizen of New York and is the owner of Bright Kids.

17. Defendant QuarterSpot Inc. ("QuarterSpot") is a corporation incorporated under the laws of the state of Delaware with its principal place of business located in New York, or in the alternative in Delaware.

## JURISDICTION AND VENUE

18. QuarterSpot is subject to the personal jurisdiction of this Court because its principal place of business is in New York.

19. Alternatively, QuarterSpot is subject to the personal jurisdiction of this Court because the claim arises from QuarterSpot's contacts with the New York forum, namely its extension of loans to New York small businesses, including Bright Kids.

20. Venue is proper because the transactions giving rise to this claim occurred substantially within the geographic boundaries of this judicial district.

## FACTUAL ALLEGATIONS

### QuarterSpot's Fraudulent Business Scheme

21. QuarterSpot is an online lending company that provides short-term loans to small businesses and consumers through an automated lending platform.

22. QuarterSpot's principal offices are located in New York, or in the alternative, Delaware. Ex. A.

23. QuarterSpot preys upon financially distressed businesses and their individual owners throughout the country, and fraudulently induces them into "Business Loan Agreements."

24. These loans often substantially exceed the statutory maximum legal interest rate in violation of state usury laws.

25. After inevitably leading small businesses to ruin by imposing unbearable terms, QuarterSpot seeks redress in courts outside of New York in order to circumvent the policies and regulations of this State.

### Bright Kids NYC and Bige Doruk

26. Bright Kids is a small tutoring business, founded in 2009 by a mother who wanted better academic options for her children.

27.     Bright Kids focuses on tutoring children of all ages to enhance their academic achievements by offering more affordable tutoring and test prep options than other competitors in the market.

28.     Bige Doruk is the founder and chief executive office of Bright Kids.

### TheQuarterSpot Loans to Bright Kids

**A.     The 2014 Loan Agreements**

29.     Bon January 14, 2014, Bright Kids entered into two Business Loan Agreements with QuarterSpot ("2014 Loan Agreements). *See* Ex. B.

30.     On its face, the first loan amount was $75,000.

31.     However, Bright Kids was charged unexplained $4,410.00 "Borrower Platform Fees," which were deducted from the loan amount.

32.     Accordingly, in reality, only $70,590 was advanced.

33.     The loan required repayment of $87,645.70.

34.     The loan provided for daily payments of $324.64.

35.     The loan provided for a term of 270 *calendar* days. Daily payments obligations would accrue on weekends on holidays; however, these daily payment obligations would not be debited from Bright Kids' accounts until the next business day.

36.     The effective simple interest rate of this loan is determined by the following equation: (nominal interest rate) / (the loan term's portion of the year).

37.     The nominal interest rate is determined by the following equation: (total interest paid / average balance.)

38.     The total interest paid on this loan is $17055.70 ($87,654.70 – 70,590.00).

39.     The average balance of the loan is $35,295.00 ($70,590.00 / 2).

40. The nominal interest rate on the loan is thus 48.3% ($17,055.70 / $35,295.00).

41. The loan term's portion of the year is 73.9% (270 / 365).

42. The loan thus had an effective annual interest rate of 65.4% (48.3% / 73.9%).

43. New York imposes a maximum annual interest rate on commercial loans of 25%. This loan thus had an effective annual interest rate more than twice the legal limit.

44. On its face, the second loan amount was $25,000.

45. However, Bright Kids was charged unexplained $1,470.00 "Borrower Platform Fees," which were deducted from the loan amount.

46. Accordingly, in reality, only $23,350.00 was advanced.

47. The loan required repayment of $29,215.23.

48. The loan provided for daily payments of $108.21.

49. The loan provided for a term of 270 *calendar* days. Daily payments obligations would accrue on weekends on holidays; however these daily payment obligations would not be debited from Bright Kids' accounts until the next business day.

50. The effective simple interest rate of this loan is determined by the following equation: (nominal interest rate) / (the loan term's portion of the year).

51. The nominal interest rate is determined by the following equation: (total interest paid / average balance.)

52. The total interest paid on this loan is $5,685.23 ($29,215.23 – $23,530.00).

53. The average balance of the loan is $11,765 ($23,530.00 / 2).

54. The nominal interest rate on the loan is thus 48.3% ($5,685.23 / $11,765)

55. The loan term's portion of the year is 73.9% (270 / 365).

56. The loan thus had an effective annual interest rate of 65.4% (48.3% / 73.9%).

57.     This loan thus had an effective annual interest rate in excess of two times the legal limit.

**B.     The 2017 Loan Agreements**

58.     Plaintiffs Bright Kids and Bige Doruk entered into an additional agreement with QuarterSpot on December 20, 2017 ("2017 Loan Agreement"). Ex. C.

59.     On its face, the first loan amount was $150,000.00.

60.     However, Bright Kids was charged an unexplained $2,250.00 "Closing Fee," which was deducted from the loan amount.

61.     Thus, in reality, only $147,750.00 was advanced.

62.     The interest due on the loan was $38,966.27.

63.     The term of the loan was 540 calendar days, to be repaid in weekly installments of $2,449.16.

64.     While the term sheet listed a 31% simple interest rate, this was not accurate.

65.     The effective simple interest rate of this loan is determined by the following equation: (nominal interest rate) / (the loan term's portion of the year).

66.     The nominal interest rate is determined by the following equation: (total interest paid / average balance.)

67.     The average balance of the loan is $73,875 ($147,750.00 / 2).

68.     The nominal interest rate is thus 52.7% ($38,966.27 / $73,875).

69.     The loan term's portion of the year is 147.9% (540 / 365).

70.     The effective simple annual interest rate is thus 35.6%.

71.     The loan is thus well over the legal interest rate.

**B.     The Agreements generally**

72. The QuarterSpot Business Loan Agreements are an unconscionable contract of adhesion.

73. The Agreements contain one-sided terms that prey-upon the desperation of small businesses and their individual owners, who enter into the contracts unaware of their unconscionable terms, which violate the laws and public policies of a number of states.

74. These one-sided terms include: (1) Loan Commitment with no right to rescind upon acceptance of loan listing; (2) a venue and choice-of-law provision requiring the merchant to litigate in a jurisdiction foreign to both parties, under the laws of that foreign jurisdiction; (3) personal guarantees, revocation of which is an event of default; and (4) one-sided attorney's fees provisions obligation the merchant to pay QuarterSpot's attorney's fees but not the other way around.

75. The Agreement also contains a number of knowingly false statements designed to evade the criminal usury laws of New York, including the following.

   (a) "Our relationship, including this Agreement and any claim or dispute or controversy…is governed by [Virginia law]";

   (b) "QuarterSpot is located in Virginia";

   (c) "QuarterSpot makes all credit decisions from QuarterSpot's office in Virginia"; and

   (d) The Loans are "made" in Virginia.

**D.    The Virginia Lawsuit**

76. On March 11, 2019, QuarterSpot filed a Complaint in the Circuit Court for Arlington County, Virginia, against Bright Kids and Doruk, alleging breach of contract on the 2017 Agreement.

77. After QuarterSpot mistakenly served the wrong individual, Plaintiffs accepted service of the Complaint by way of waiver on September 21, 2020.

## CLASS ALLEGATIONS

78. Plaintiffs and the putative Classes repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

79. Plaintiff Bright Kids bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> **Merchant Class**: All merchants incorporated in and/or with principal places of business in New York state who, on or after October 12, 2016, paid money to the Enterprise pursuant to a QuarterSpot Business Loan Agreement with an effective interest rate exceeding twenty-five percent, where QuarterSpot alleges that some portion of the Loan Agreement remains due and owing.

80. Plaintiff Doruk bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> **Principal Class**: All persons who, on behalf of merchants incorporated in and/or with principal places of business in New York state who, on or after October 12, 2016, paid money to the Enterprise pursuant to a personal guaranty contained in the QuarterSpot Business Loan Agreement an effective interest rate exceeding twenty-five percent, where QuarterSpot alleges that some portion of the Loan Agreement remains due and owing. .

81. The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

82. **Numerosity**: The exact number of members of the Classes is unknown and it not available to Plaintiffs at this time, but individual joinder in this case is impracticable. Based on publicly available documents, each of the Classes likely numbers in the thousands.

83. **Commonality and Predominance**: There are many questions of law and fact common the claims of Plaintiffs and the other Class members, and those questions predominate over any question that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

    (a) Whether the loans at issue are criminally usurious;

    (b) Whether the loans at issue violate the public policy of the state of New York;

    (c) Whether the loans or personal guaranties at issue are enforceable;

84. **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes.

85. **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experience in complex litigation and class actions. Neither Plaintiffs nor their counsel have interests antagonistic to the Classes.

86. **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by theby the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if

members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**(Declaratory Relief under: 28 U.S.C. § 2201)**
**By Plaintiffs and the Merchant and Principal Classes**
**Against QuarterSpot**

87. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

88. The QuarterSpot Business Loan Agreements are void as against the public policy of New York, because they exceed 25% annual interest.

89. An actual, present justiciable controversy exists between the parties, because QuarterSpot is attempting to enforce these Agreements in the Virginia action and through other means.

90. Plaintiffs seek declaratory judgment from this Court that the Business Loan Agreements are void and unenforceable.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

a) Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class Representatives, and appointing their attorneys as class counsel;

b) Declaring that the Agreements entered into between Plaintiffs and Class Members and QuarterSpot are void and unenforceable;

c) Permanently enjoining Defendants from engaging in the unlawful practices;

g) Awarding Plaintiffs and the Class Members their attorney's fees and costs incurred in this action; and

h) Granting such other and further relief as this Court deems just and proper.

DATED: New York, New York
January 11, 2021

**WHITE AND WILLIAMS LLP**

By: /s/ Shane R. Heskin
Shane R. Heskin
Justin E. Proper
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com

*Attorneys for Plaintiffs*

**BENESCH, FRIEDLANDER COPLAN & ARONOFF LLP**

J. Dominick Larry (*pro hac vice* pending)
71 S. W. Wacker Dr., Suite 1600
Chicago, IL 60606
Tel: (312) 212-4949

*Attorneys for Plaintiffs and Putative Class Members*

## CERTIFICATE OF SERVICE

I, Shane R. Heskin, Esq., hereby certify that on January 11, 2020, I caused a copy of the foregoing papers to be served on all counsel of record via ECF.

**WHITE AND WILLIAMS LLP**

By: _____
Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com

26423339v.1